Filed 11/30/20

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B294632 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA117445) |
| v. | |
| RENE AVILA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven D. Blades, Judge. Remanded for resentencing.

Tracy L. Emblem, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah Hill, Michael C. Keller and Charles J. Sarosy, Deputy Attorneys General, for Plaintiff and Respondent.

---

*Discussion sections I and II are not certified for publication. (See Cal. Rules of Court, rules 8.1105, 8.1110.)

A jury found Rene Avila guilty of attempted robbery and of attempted extortion. On appeal, he contends that reversal of the judgment is required because gang evidence was erroneously admitted against him and there is insufficient evidence to support attempted extortion. In the unpublished portion of this opinion, we reject these contentions. However, in the published portion of this opinion, we find that the trial court abused its discretion by denying Avila's *Romero*[1] motion and, moreover, the sentence imposed on Avila is cruel or unusual punishment under our California Constitution. We therefore remand for resentencing.

## BACKGROUND

On February 19, 2018, Bernardino Castro was selling oranges and flowers at a freeway off-ramp. Castro speaks Spanish and understands some English. Using a Spanish speaking companion to speak to Castro, Avila told Castro to pay him $100 in rent in order to sell at the location, claiming that it was his "barrio," which Castro understood as a reference to gangs. When Avila said "money," Castro understood that Avila was asking for $100. Avila left but returned the next day and asked for the money. When Castro said he didn't have the money, Avila squashed two bags of oranges and left. Castro testified that the interaction with Avila made him "nervous" and that he thereafter sold his oranges at a different location because he was afraid Avila would do something to him.

The next day, February 21, 2018, Pedro Blanco-Quiahua was selling oranges near the same freeway off-ramp. Avila

---

[1] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

approached and threw a bag of oranges on the ground, stomped on them, and said, "money, money, money." Avila then stomped on another bag of oranges. Scared, Blanco-Quiahua backed away. Avila left. A witness who worked nearby had noticed Avila sitting for more than 20 minutes in front of a shop. The witness saw Avila tossing bags of oranges into the dirt and heard Avila say, "[m]oney, give me money."

Based on this evidence, a jury found Avila guilty of the attempted second degree robbery of Blanco-Quiahua (Pen. Code,[2] §§ 664, 211; count 1) and of the attempted extortion of Castro (§§ 664, 518; count 2). On November 30, 2018, the trial court denied Avila's *Romero* motion to strike a prior conviction and sentenced him to 25 years to life plus 14 years.

## DISCUSSION

I. Admission of gang evidence

Although the trial court excluded gang evidence, a prosecution witness referred to gangs. Avila now contends that this reference to gangs violated his due process right to a fair trial; hence, his motion for a mistrial should have been granted.

A. *Additional background*

Avila was not charged with a gang allegation, and there was no evidence the crimes were gang-related. The trial court therefore excluded evidence a witness thought Avila was a gang member, finding the evidence to be more prejudicial than

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

3

probative.  Accordingly, the trial court directed the prosecutor to remind her witnesses not to mention gangs.

Notwithstanding the trial court's order, the prosecutor asked Castro, when Avila "said to you that this was his barrio, what did that mean to you?"  The witness responded, "That he is a gang member or something like that."  The prosecutor asked if Castro was in fear for his safety, and the trial court then sustained defense counsel's leading objection to that question.  Out of the jury's presence, the prosecutor explained that she had told witnesses not to mention gangs but had failed to have a specific conversation with Castro.  The defense moved for a mistrial.  In response, the prosecutor asserted that she did not know the witness would say "barrio" meant gang to him.[3]  The trial court denied the mistrial motion but offered to give a curative instruction upon request.  Defense counsel did not ask for a curative instruction, and none was given.

B.    *Avila's right to a fair trial not irreparably damaged*

Avila moved for a mistrial based on Castro's statement he thought Avila was referring to gangs when Avila used the word "barrio."  Such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged.  (*People v. Clark* (2011) 52 Cal.4th 856, 990.)  Whether a particular incident is incurably prejudicial requires a nuanced, fact-based analysis which the trial court is in the best position to conduct.  (*People v. Chatman* (2006) 38 Cal.4th 344, 369–370.)

---

[3] The prosecutor later recollected that "maybe" she did tell Castro not to use the word gang and confirmed with her investigating officer that she had.

4

Hence, we review an order denying a motion for mistrial under the deferential abuse of discretion standard. (*Clark*, at p. 990.)

Given the potentially prejudicial effect of gang membership evidence, it should be excluded in cases not involving a gang enhancement, where its probative value is minimal. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223; accord, *People v. Avitia* (2005) 127 Cal.App.4th 185, 192.) Gang evidence is inadmissible to show a defendant's criminal disposition or bad character as a vehicle to create an inference the defendant committed the crime. (*Avitia*, at p. 192.)

Here, there was no evidence the crimes were gang-related, and there was no gang allegation. The trial court therefore properly excluded gang evidence. Castro's testimony that he understood Avila's reference to "barrio" to mean that Avila was a gang member should not have come in. Even so, when a witness's volunteered statement is not attributable to either party, a mistrial is called for only if the misconduct is so inherently prejudicial as to threaten the defendant's right to a fair trial despite admonitions from the court. (*People v. Molano* (2019) 7 Cal.5th 620, 675–676.) Although the trial court indicated it would give a curative instruction at the request of the defense, the defense did not request one, presumably as a matter of strategy as defense counsel had expressed concerns about highlighting the issue for the jury.

Notwithstanding the inflammatory nature of gang evidence, the lone and fleeting reference to gang evidence did not deprive Avila of a fair trial. Castro merely testified that when Avila said "barrio," Castro thought he was a gang member.

Beyond Castro's speculation, there was no other evidence Avila was a gang member.[4]

Avila, however, argues that the comment was highly prejudicial because it went to the use of a threat, fear, or force element of attempted extortion in CALCRIM No. 1830. He suggests the gang evidence was the only evidence that Avila threatened Castro. That is incorrect. When Castro refused to give Avila money, Avila crushed a bag of oranges. This act satisfied the element, especially when considered in the context of Avila's demand. (See *People v. Bollaert* (2016) 248 Cal.App.4th 699, 725 [threat implied from all circumstances].) Thus, there was other compelling evidence that Avila threatened Castro or used force or fear in his attempt to extort money, apart from the lone reference to gangs.

*People v. Avitia, supra*, 127 Cal.App.4th 185 is distinguishable. The defendant in that case was charged with grossly negligent discharge of a firearm. (*Id.* at p. 191.) The trial court admitted evidence that there was gang graffiti in Avitia's bedroom. *Avitia* found that the gang evidence was irrelevant to any issue at trial, as there was no allegation the crime was gang-related, and the evidence did not link Avitia to the guns. The evidence was particularly irrelevant given that it was undisputed Avitia possessed the guns. Further, the Court of Appeal found that the gang evidence severely undercut Avitia's defense and credibility. That is, Avitia contended he was a former military small arms repairman and gun hobbyist who was conducting target practice with a pellet gun, which is a lawful activity. But

---

[4] Avila has a teardrop tattoo on his face, but no evidence or mention was made about it at trial.

6

evidence he was a gang member suggested he had a criminal disposition; hence, his story was false, and his arsenal of guns presented a danger to the community.  (*Id.* at p. 195.)  *Avitia* thus concluded that the gang evidence prejudiced Avitia.

We do not perceive any similar prejudice here.  The gang evidence did not undercut any defense or suggest that the witness's version of events was false, i.e., that Avila did not demand money or crush the oranges.  Rather, as we have said, to the extent the gang evidence went to the force or fear element of the crimes, there was other compelling evidence of that element.

Avila also points out that CALCRIM No. 1830 states the "threat may involve harm to be inflicted by the defendant *or someone else*."  (Italics added.)  He argues that the jury would have understood the "someone else" to be a gang member based on Castro's stray remarks and comments the prosecutor made in closing argument that Avila was "terrorizing" the victims.  However, "terrorizing" was not the prosecutor's word.  A witness used that word to describe what Avila did to Blanco-Quiahua.  In repeating that word in her closing argument, the prosecutor drew no connection to gangs.

II.     Sufficiency of the evidence

Avila next contends there is insufficient evidence of attempted extortion, specifically, that he accomplished the crime by threat or force.[5]  We disagree.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it

---

[5] The trial court denied Avila's section 1118.1 motion as to this count.

7

contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

Extortion is obtaining another's property or other consideration, with the person's consent but induced by the wrongful use of force or fear. (§ 518.) The elements of attempted extortion are a specific intent to commit extortion and a direct but ineffectual act done toward its commission. (*People v. Ochoa* (2016) 2 Cal.App.5th 1227, 1230.) A defendant may induce fear by a threat to do an unlawful injury to the person or property. (§ 519.)

Likening this case to *People v. Ochoa*, *supra*, 2 Cal.App.5th 1227, Avila contends there was no evidence he attempted to use a threat or force to induce Castro to give him money. *Ochoa* is not on point because the person or entity from whom the defendant in that case tried to extort money was not the victim identified in the information. Since there was no evidence the defendant tried to extort money from the person named in the information, *Ochoa* is more about the procedural due process requirement of giving a defendant notice of the specific charge than it is about sufficiency of the evidence.

As to the sufficiency of the evidence here, Avila makes much of his use of a translator to convey his threat to Castro. In

doing so, Avila misstates the record when he asserts that Castro did not understand what Avila and the translator were saying. To the contrary, Castro's limited English did not prevent him from concluding that Avila wanted money. Moreover, when Avila returned the next day without a translator and demanded "the money," Castro understood. Avila then crushed Castro's oranges, driving home his point so clearly that Castro was afraid to sell at the location for several days.

Avila argues he did not attempt to use force or a threat because he crushed the oranges *after* Castro refused to give him money. However, Castro—and the jury—could have reasonably understood that Avila crushed the oranges to force Castro into relenting. In any event, attempted extortion does not contain a timing requirement regarding when the force or threat must be applied, especially where, as here, the entire event occurs in a short period of time. Rather, as we have said, the threat may be implied from all the circumstances. (*People v. Bollaert, supra*, 248 Cal.App.4th at p. 725.)

III.    *Romero*

Avila admitted having three prior strikes within the meaning of the "Three Strikes" law. The trial court denied Avila's *Romero* motion to strike any of them. Avila now contends that the trial court abused its discretion by denying his motion. We agree.

While the purpose of the Three Strikes law is to punish recidivists more harshly (*People v. Davis* (1997) 15 Cal.4th 1096, 1099), not all recidivists fall within the spirit of that law. A trial court therefore may strike or dismiss a prior conviction in the furtherance of justice. (§ 1385, subd. (a); *Romero, supra*, 13 Cal.4th at p. 504.) When considering whether to strike a prior

9

conviction, the factors a court considers are whether, in light of the nature and circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of the defendant's background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though the defendant had not previously been convicted of one or more serious and/or violent felonies. (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

We review a trial court's ruling on a *Romero* motion under the deferential abuse of discretion standard, which requires the defendant to show that the sentencing decision was irrational or arbitrary. (*People v. Carmony* (2004) 33 Cal.4th 367, 375, 378.) It is not enough that reasonable people disagree about whether to strike a prior conviction. (*Id.* at p. 378.) The Three Strikes law "not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm . . . [T]he law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Ibid.*) Only extraordinary circumstances justify finding that a career criminal is outside the Three Strikes law. (*Ibid.*) Therefore, "the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Ibid.*)

That only extraordinary circumstances justify deviating from the three strikes sentencing scheme does not mean such cases do not exist. (*People v. Vargas* (2014) 59 Cal.4th 635, 641.) And the abuse of discretion standard is neither "empty" (*People v. Williams*, *supra*, 17 Cal.4th at p. 162) nor are all recidivists the kind of career criminals appropriately considered under that

10

scheme.  Cumulative circumstances, including that a defendant's crimes were related to drug addiction and the defendant's criminal history did not include actual violence, may show that the defendant is outside the spirit of the Three Strikes law. (*People v. Garcia* (1999) 20 Cal.4th 490, 503.)  Also, an abuse of discretion may be found where a trial court considers impermissible factors, and, conversely, does not consider relevant ones.  (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.)

That is precisely what occurred here.  The trial court did not consider factors relevant to the nature and circumstances of Avila's prior strikes.  Avila committed his first strike offenses (a second degree robbery and an assault with a knife) on the same occasion[6] in 1990 when he was 18 years old.[7]  According to the preliminary hearing transcript in that case, Avila and two accomplices robbed a man who was filling newspaper vending machines.  The man testified that Avila held a knife to his throat, and the man's arm was cut when the man threw his arm up.  Avila was paroled in 1991.  Then, in 1992, when Avila was 20 years old, he committed his last and most recent strike offense, a

---

[6] Multiple convictions arising from a single act against a single victim count as one strike.  (*People v. Vargas*, *supra*, 59 Cal.4th at p. 637.)  Avila's robbery and assault with a deadly weapon were not a single act, and therefore *Vargas* does not apply.  Nonetheless, *Vargas* does not preclude a trial court from *considering* that strikes were committed on the same occasion as relevant to the nature and circumstances of those crimes, even if that fact does not *compel* striking a prior.

[7] As a juvenile, Avila had six sustained petitions primarily for being under the influence of drugs or possessing them, although he also had a sustained petition for burglary and for resisting arrest.

11

second degree robbery, as well as possession of a firearm by a felon. He was sentenced to 10 years in prison.[8]

In evaluating these prior strikes, the trial court appeared to agree they were remote in time but then noted that section 667, subdivision (c)(3) provides that the time between a strike and the current felony does not affect the imposition of sentence. The trial court said it was "not quite sure how that coincides with this [case], but so be it." However, all that section suggests is that the remoteness of prior strikes alone is not sufficient to take a defendant out of the spirit of the Three Strikes law. Still, remoteness remains a factor in mitigation. (See *People v. Strong* (2001) 87 Cal.App.4th 328, 342; *People v. Bishop* (1997) 56 Cal.App.4th 1245, 1250–1251.) Avila's prior strikes were from 1990 and 1992, so they were 28 and 26 years old, respectively, when he committed the current offenses in 2018. That is a significant lapse of time to say the least.

It is also significant that Avila committed his prior strikes when he was under the age of 21. Had he committed those crimes now while that age, he would be considered a youth offender entitled to expanded parole consideration. (See, e.g., § 3051, subd. (a)(1) [youth offender is a person 25 years old or younger].) The trial court noted that Avila's age when he committed the strikes does not preclude a sentence, though it comes into play when he is eligible for parole. That much is true. But it is not the salient point for the purposes of *Romero*. Avila's age when he committed his strikes, even if not dispositive, is

---

[8] Avila was paroled in November 1997, but parole was revoked five months later. In August 1998, he was released on parole, which was again revoked two months later.

12

plainly relevant to the nature and circumstances of the strikes and could be a mitigating factor. This is in line with the increasing recognition that young adults are constitutionally different from adults for sentencing purposes because of their diminished culpability and greater prospects for reform. (See, e.g., *In re Jenson* (2018) 24 Cal.App.5th 266, 276 & cases cited therein.) That we are considering what sentence to impose on the *middle-aged* Avila does not preclude consideration that it was a *youthful* Avila who committed the prior strikes, for the purposes of *Romero*. The trial court, however, mistakenly believed that it could not consider this mitigating factor at sentencing.

Instead, the trial court's decision that Avila fell within the spirit of the Three Strikes law hinged primarily on the nature and circumstances of his current offenses. The trial court noted that Avila had victimized vulnerable people eking out a living by selling fruit. What right, the trial court questioned, did Avila have to charge rent to people selling things on the street? The trial court added that Avila committed his current crimes in a "violent" and "brutal" way by intimidating victims making just $300 a week. "His acts really amounted to thuggery." The trial court then speculated that had someone not called the police, "who knows what would have happened."

Without a doubt, Avila's conduct was offensive. Preying on some of the most vulnerable people in society is contemptible. The prosecutor's own opening statement aptly characterized Avila as a "bully." However, the trial court speculated about what might have happened had the police not been called, implying the infliction of physical harm to the victims that never appeared in the evidence at trial. Sentencing is not the proper venue for the trial court's imagination. Ruling on a *Romero*

13

motion requires consideration of the nature and circumstance of the crime actually committed, not a crime that might have occurred. Moreover, the record does not support the trial court's speculation. When the victims refused to give Avila money, he destroyed several bags of oranges and left. While we do not make light of this intimidating behavior, it was not violent or brutal by any stretch. Avila did not use a weapon or otherwise use physical violence against the victims, nor did he make any specific threats. He squashed oranges.

In characterizing Avila's current crimes as violent, the trial court misapprehended their nature. Attempted robbery is a serious crime but not a violent one. (§ 1192.7, subd. (c)(19), (39).) Attempted extortion is neither a violent nor serious crime. (§§ 667.5, subd. (c), 1192.7, subd. (c).) Nor was the trial court merely hyperbolically describing Avila's crimes as violent. The trial court erroneously sentenced Avila as a violent offender by limiting his conduct credits to a maximum of 15 percent of actual time served under section 2933.1, subdivisions (a) and (c).

The fact is that Avila has not committed a violent felony since his strike offenses, showing that the severity of his record is decreasing. The trial court took note of this circumstance but otherwise noted that Avila "still ha[d] been to prison a couple of times since." But for what did Avila go to prison we ask? In 1999, Avila was convicted of unlawful sexual intercourse with a minor under the age of 16 (§ 261.5, subd. (d)) and sentenced to four years in prison. He later married her, and they had a child together.[9] Avila was convicted in 2005 of misdemeanor drug

---

[9] Avila's victim/wife stated that her mother allowed the relationship.

14

possession. His last felony offense was in 2008 for drug possession in violation of Health and Safety Code section 11350, subdivision (a), a crime which has since been reclassified as a misdemeanor under Proposition 47 (see *People v. Valencia* (2017) 3 Cal.5th 347, 355). Thus, Avila's poststrike criminal history is not characterized by serious or violent crimes.

Also, after being incarcerated for the 2008 drug possession, Avila was released from prison in 2011. The record does not show that Avila committed any crimes while incarcerated from 2008 to 2011. Upon his release in 2011, he incurred misdemeanors for possessing a controlled substance, being an unlicensed driver, and driving on a suspended license. Otherwise, he remained crime free until committing the current offenses in 2018. Given Avila's decade long period of committing no felonies and the minor nature of the offenses he did commit during that period, it is inaccurate to characterize him as a career or habitual criminal or, in the prosecutor's words, as having a "continuous criminal history" from 1989 to the present. Avila is not comparable to the defendant who has led a continuous life of crime so as to counteract the extreme remoteness of his priors. (See, e.g., *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813.)

With respect to Avila's background, character and prospects, the trial court referred to Avila's drug addiction but did not reach a conclusion whether it was a mitigating or aggravating factor, instead noting that it could be a mitigating factor unless Avila failed to address the problem, in which case it could be an aggravating factor. (See generally *People v. Gaston* (1999) 74 Cal.App.4th 310, 322.) While we do not disagree with the general notion that a defendant's drug problem may have

15

little mitigating value where the problem is longstanding (see, e.g., *People v. Regalado* (1980) 108 Cal.App.3d 531, 539–540), we disagree that is always necessarily the case (see Cal. Rules of Court, rule 4.423(b)(2) [defendant's mental or physical condition is mitigating factor in sentencing]). Just as the law is evolving in its understanding and treatment of juvenile offenders, it is evolving in how it treats drug users. Since the passage of Proposition 47, for example, nonserious, nonviolent drug possession offenses are misdemeanors rather than felonies. (*People v. DeHoyos* (2018) 4 Cal.5th 594, 597.)

According to Avila's *Romero* motion, which included a mitigation report, Avila began using drugs when he was 12 years old. His father, who also abused drugs and alcohol, gave him PCP and cocaine as a child. As a juvenile, Avila received treatment for his drug addiction, which helped. After being released from prison in 2004, he continued to struggle with drug addiction (as evidenced by his 2005 and 2008 misdemeanor drug possession convictions) but he tried to become sober and was able to get a job as a trailer driver, which required him to obtain a class A driver's license. However, in 2016, he was injured in a car accident, which left him with neck and back pain. He began drinking and using drugs again. Just one month after the car accident, he was in a second car accident, after which his driver's license was suspended, so he was laid off from work.[10] Thus, Avila has clearly struggled with drug addiction since he was a

_____

[10] Avila also has been shot three times: when he was 16 years old a bullet grazed him while he was at a party; when he was 26 years old he was shot and, as a result, hospitalized for two weeks; and in 2017, he was shot in the elbow, which required surgery.

16

child.  But it cannot be said he has never addressed it.  He had treatment for it when he was a juvenile.  After Avila was released from prison in 2004, he tried to become sober and obtained and maintained gainful employment.  Further, Avila's wife spoke well of his character, reporting he was a good father to their daughter and supported their child when he had a job.

Avila's age, 47 when sentenced, is also relevant to his background, character, and prospects.  Although Avila's middle age status alone does not remove him from the spirit of the Three Strikes law (see *People v. Strong*, *supra*, 87 Cal.App.4th at pp. 332, 345), given his age, his three strikes sentence coupled with the determinate term means he will likely die in prison.  Avila indeed may be deserving of a lengthy sentence.  But even under the defense's proposed 12 years four months sentence,[11] Avila would have been imprisoned and not eligible for parole until approaching 60 years of age.  The length of a sentence is the "overarching consideration" in deciding whether to strike a prior conviction because the underlying purpose of striking a prior conviction is the avoidance of unjust sentences.  (*People v. Garcia*, *supra*, 20 Cal.4th at p. 500.)

For these reasons, no reasonable person could agree that the sentence imposed on Avila was just.  Avila's prior strikes were remote and committed when he was of diminished culpability based on his age, a factor the trial court erroneously concluded was inapplicable to the formulation of his sentence.  Despite the trial court's characterization of the facts, Avila's

---

[11] The proposed 12 years four months sentence was composed of the high term of three years doubled to six years and five years for the prior on count 1 plus eight months doubled to 16 months on count 2.

17

current offenses were not violent and, on the spectrum of criminal behavior, fall closer to the end of less reprehensible conduct.  Much of his criminal conduct appears to be related to his drug addiction rather than to sinister motives and falls well outside the realm of what could be considered the work of a career criminal.  We therefore conclude that the trial court abused its discretion by denying Avila's *Romero* motion.

IV.  Cruel or unusual punishment

Worse, Avila's sentence is cruel or unusual punishment under the California Constitution, article I, section 17.[12]  A punishment is cruel or unusual in violation of the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).)[13]  Three techniques are employed to make this determination:  first, we examine the nature of the offense and/or the offender with particular regard to the degree of danger both present to society; second, compare the challenged penalty with

---

[12] Avila's counsel did not object that the sentence was cruel and/or unusual punishment, thereby forfeiting the claim on appeal.  However, we have the discretion to address the merits. (See, e.g., *People v. Reyes* (2016) 246 Cal.App.4th 62, 86; *In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7.)

[13] The Eighth Amendment of the United States Constitution prohibits cruel *and* unusual punishment.  The distinction in wording between the federal and state constitutions is substantive and not merely semantic. (*People v. Baker* (2018) 20 Cal.App.5th 711, 723.)  We decide Avila's case only under the California Constitution.

the punishments for more serious offenses in California; and third, compare the challenged penalty with the punishments prescribed for the same offense in other states. (*Id.* at pp. 425–427.) Disproportionality need not be established in all three areas. (*People v. Dillon* (1983) 34 Cal.3d 441, 487, fn. 38.)

In our tripartite system of government, the legislative branch defines crimes and prescribes punishment. (*Lynch*, *supra*, 8 Cal.3d at p. 414.) It is therefore the rare case where a court could declare the length of a sentence mandated by the Legislature unconstitutionally excessive. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.) Even so, it is the judiciary's responsibility to condemn any punishment that is cruel or unusual. (*Lynch*, at p. 414.) We independently review whether a punishment is cruel or unusual, considering any underlying disputed facts in the light most favorable to the judgment. (*People v. Edwards* (2019) 34 Cal.App.5th 183, 190.)

### A. *The nature of the offense and of the offender*

The first *Lynch* technique requires considering the nature of the offense in the abstract as well as the facts of the crime in question, "i.e., the totality of the circumstances surrounding the commission of the offense . . . , including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People v. Dillon*, *supra*, 34 Cal.3d at p. 479.) Courts must view the nature of the offender in the concrete rather than the abstract, considering the defendant's age, prior criminality, personal characteristics, and state of mind. (*Ibid.*) Stated simply, the punishment must fit the individual criminal. (*Lynch*, *supra*, 8 Cal.3d at p. 437.)

Where, as here, the defendant is a recidivist, it is not as a general rule cruel or unusual to enhance a sentence based on the

defendant's status as a recidivist; still, "the ultimate punishment, all facts considered," must not be disproportionate to the crime. (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 359; see *Solem v. Helm* (1983) 463 U.S. 277, 284–288.) "Accordingly, the current offense must bear the weight of the recidivist penalty imposed." (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1072.) Because the penalty is imposed for the current offense, the focus must be on the seriousness of *that* offense: past offenses alone will not justify imposing an enhanced sentence. (*Id.* at pp. 1079–1080.)

Avila's current offenses are attempted robbery and attempted extortion. Neither are violent crimes, and extortion is neither serious nor violent. (§§ 667.5, subd. (c), 1192.7, subd. (c).) Although both require the attempt to use force or fear (§§ 211, 518), Avila did not use violence against either of his victims. He did not verbally or physically threaten them. Rather, when the victims refused to give Avila money, he crushed their oranges and left. Avila's motive for his crimes is unclear, though it is reasonable to infer it was financial, given that he demanded money. Also, the total amount of property damage was about $20 worth of citrus, a point we make because it is relevant to the minor nature of the offenses and not to trivialize the worth of the property to the victims. The unsophisticated nature of the attempted robbery and attempted extortion committed by Avila are thus not comparable to armed robberies, which have been described as most heinous in nature (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 570).

As to the consequences of Avila's actions, he frightened the victims, so much so that Castro sold his fruit at a different location for several days. However, there are "rational gradations of culpability that can be made on the basis of the

injury to the victim or to society in general." (*In re Foss* (1974) 10 Cal.3d 910, 919.) Here, the victims were physically uninjured even if emotionally traumatized. Although trying to force vendors to pay rent is an affront to society, the harm the victims suffered is arguably less than that caused by the crime of indecent exposure, which our California Supreme Court described as "minimal at most" and not a "sufficiently grave danger to society to warrant the heavy punishment of a life-maximum sentence." (*Lynch*, *supra*, 8 Cal.3d at p. 431.) A punishment passes constitutional muster only if the totality of the circumstances surrounding the current offenses can bear the weight of the sentence imposed. (See *People v. Carmony*, *supra*, 127 Cal.App.4th at p. 1072.) Avila's current offenses alone cannot justify the sentence imposed. It bears repeating: he squashed oranges and was sentenced to life.

Clearly, Avila's sentence is primarily attributable to his recidivist status. But the life sentence required by the Three Strikes law must consider "variations in individual culpability." (*People v. Carmony*, *supra*, 127 Cal.App.4th at p. 1087.) A "one-size-fits-all" sentence is disproportionate to a current offense where the current offense is "minor and the prior convictions are remote and irrelevant to the offense." (*Id.* at p. 1088.)

An example of a minor offense is failing to update sex offender registration. (*People v. Carmony*, *supra*, 127 Cal.App.4th at p. 1071; but see *People v. Meeks* (2004) 123 Cal.App.4th 695.) The defendant in *Carmony*, at page 1071, had three prior serious or violent felonies and was sentenced to 25 years to life under the Three Strikes law. Given the minimal and harmless nature of the defendant's current offense and the relatively light penalty for a simple violation of registration

21

requirements, his prior offenses almost wholly accounted for the extreme penalty imposed.  (*Carmony*, at p. 1080.)  After considering the *Lynch* techniques, the court acknowledged that the three strikes sentence was cruel or unusual punishment.  (*Carmony*, at pp. 1086–1089.)  In so doing, the court noted it is the rare case that violates the prohibition against cruel or unusual punishment.  (*Id.* at p. 1072.)  Still, there is a "bottom to that well."  (*Ibid.*)  A passive, nonviolent, regulatory offense that poses no direct or immediate danger to society is the bottom of that well.  (*Id.* at p. 1078.)

In contrast, a 25-years-to-life sentence imposed on a recidivist whose current offenses were for heroin possession and receiving stolen property was not found by another court to be cruel or unusual.  (*People v. Mantanez, supra*, 98 Cal.App.4th at pp. 356, 366–367.)  The defendant in *Mantanez*, at page 366, had an extensive criminal history spanning 17 years and including 10 felony convictions and four separate prison terms.  His felonies included forcible entries into occupied homes, and he repeatedly violated parole and probation.  (*Ibid.*)  This "long criminal career" brought the defendant squarely within the Three Strikes law.  (*Ibid.*; see, e.g., *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1172–1173 [defendant had 10 current offenses and lengthy criminal record]; *People v. Haller* (2009) 174 Cal.App.4th 1080, 1088 [current offense involved threats of violence]; *People v. Martinez* (1999) 71 Cal.App.4th 1502, 1507–1508 [current offense involved gun; priors included violent felonies and 50 misdemeanors]; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1337–1338 [current offense for grand theft and priors included 12 residential burglaries].)

If Avila's current offenses are not at the bottom of the well like the one in *People v. Carmony*, *supra*, 127 Cal.App.4th 1066, they are certainly in that neighborhood. Neither do they place him alongside recidivists for whom a three strikes sentence is constitutional. Rather, given the relatively minor nature of Avila's current conduct, his sentence rests on his prior offenses. There are, however, discernable gradations of culpability among prior offenses that must be accounted for when imposing sentence. (*In re Grant* (1976) 18 Cal.3d 1, 10, 13.) His criminal record is worthy of exploration. Avila's prior strikes occurred almost 30 years before his current crimes. The only crimes he committed involving actual violence were his first two, the second degree robbery and assault with a knife, which he committed on the same occasion in 1990 when he was 18 years old. He committed his third strike for second degree robbery in 1992, when he was 20 years old. His 1999 conviction of unlawful sexual intercourse with a minor involved a victim whom he married and with whom he had a child.[14] And his last felony conviction in 2008 was for drug possession, which would now be a misdemeanor.

Avila's drug addiction provides a backdrop to this criminal history. His status as a drug addict cannot itself be punished. (See U.S. Const., 14th Amend.; *Robinson v. California* (1962) 370 U.S. 660, 667; *In re Foss*, *supra*, 10 Cal.3d at p. 921.) Conduct that drug addiction causes (e.g., use, possession, or sale) can be punished. (*Foss*, at p. 921.) These two truisms often intersect when it comes to punishment.

---

[14] It is unclear whether they remain married.

The petitioner in *In re Foss, supra*, 10 Cal.3d at page 916, for example, was convicted of five counts of furnishing heroin in violation of the Health and Safety Code. He had a prior for possessing heroin that caused him to be sentenced to prison for 10 years to life without the possibility of parole for a period of not less than 10 years. (*Ibid.*) In considering the constitutionality of that recidivist provision precluding parole consideration for a mandatory minimum term, the court found that drug addiction was a "compelling consideration" in determining whether the punishment was cruel or unusual. (*Id.* at p. 923.) "Measured from the evolving standards of decency that mark the progress of a maturing society," the court found that the mandatory minimum term was "cruel in its failure to consider the extent to which the addict's repetition of proscribed behavior is attributable to his addiction." (*Ibid.*; see *In re Rodriguez* (1975) 14 Cal.3d 639, 655 [limited intelligence and inability to cope with inadequacies partly explained criminal conduct].) *Foss* thus supports the simple proposition that drug addiction is a factor to consider in relation to the nature of the offender.[15]

In sum, the first *Lynch* technique shows that Avila's sentence lacks proportionality to his crimes.

B. *Comparing punishments intrastate and interstate*

*Lynch*'s second and third techniques to determine disproportionality require comparing Avila's punishment with those imposed for more serious offenses in California and in other jurisdictions. Avila thus argues that his third strike sentence

---

[15] To be clear, we do not cite *Foss* for the proposition that Avila cannot or should not be punished for his current crimes *because* he is a drug addict.

plus the determinate term is disproportionate to the sentence for attempted robbery, which carries a 16 months two- or three-year term (§ 213, subd. (b)). He also compares it to the nine-year maximum sentence for first degree robbery (§ 213, subd. (a)(1)(A)) and for carjacking (§ 215, subd. (b)). However, Avila was not sentenced just for his current offenses. He was sentenced as a habitual offender. As such, any comparison would be to sentences given to other recidivists, a comparison Avila has not undertaken.[16] As to national recidivist statutes, versions of California's Three Strikes law are common, but California's law has been among the " 'most extreme.' "[17] (*People v. Sullivan*, *supra*, 151 Cal.App.4th at p. 572.) For this reason, Avila acknowledges the difficulty in comparing three strikes schemes among states.

It is unnecessary to establish disproportionality using all three *Lynch* techniques. (*People v. Dillon*, *supra*, 34 Cal.3d at p. 487, fn. 38.) Nonetheless, the evolving state of California's criminal jurisprudence is relevant to an analysis of disproportionality and, hence, to what is cruel or unusual

---

[16] Some courts have found the second *Lynch* technique inapplicable to three strikes cases because the defendant is being punished for the current offense and his recidivism. (See, e.g., *People v. Sullivan, supra*, 151 Cal.App.4th at pp. 571–572; *People v. Cline, supra*, 60 Cal.App.4th at p. 1338.)

[17] The People point out that California's Three Strikes law is not even the most extreme. Louisiana imposes life without the possibility of parole (LWOP) for a third felony when all three felonies are violent or a sex offense. (La. Rev. Stat. Ann. § 15–529.1.) Mississippi imposes LWOP for a third felony if any of three felonies was violent. (Miss. Code Ann. § 99–19–83.)

punishment under our state constitution. Our Three Strikes law has undergone significant change. As originally enacted in 1994, "the Three Strikes law required that a defendant who had two or more prior convictions of violent or serious felonies receive a third strike sentence of a minimum of 25 years to life for any current felony conviction, even if the current offense was neither serious nor violent." (*People v. Johnson* (2015) 61 Cal.4th 674, 680.) Then, voters recognized that the Three Strikes law had strayed from their intent in passing it. Voters therefore passed Proposition 36, the Three Strikes Reform Act of 2012 "to restore the original intent of California's Three Strikes law—imposing life sentences for dangerous criminals like rapists, murderers, and child molesters." (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) Prop. 36, § 1, p. 105.) To that end, a defendant now may be sentenced as a third striker only if the new felony is serious or violent.

Additional changes to recidivist laws are afoot. Courts now have discretion to strike section 12022.5 and 12022.53 firearm enhancements (Sen. Bill No. 620 (2017–2018 Reg. Sess.) §§ 1, 2) and five-year enhancements under 667, subdivision (a) (Sen. Bill No. 1393 (2017–2018 Reg. Sess.) §§ 1, 2). One-year prison priors under section 667.5 are now limited to sexually violent offenses (Sen. Bill No. 136 (2019–2020 Reg. Sess.) § 1). Health and Safety Code section 11370.2 enhancements are now limited to prior convictions for sales of narcotics involving a minor in violation of Health and Safety Code section 11380 (Sen. Bill No. 180 (2017–2018 Reg. Sess.) § 1).

Other changes implicate California's cruel or unusual jurisprudence. We have already observed the law's fairly recent evolution in how we treat juvenile offenders. Thus, the Eighth

Amendment prohibits imposing the death penalty on juveniles (*Roper v. Simmons* (2005) 543 U.S. 551), LWOP on juveniles who commit nonhomicide offenses (*Graham v. Florida* (2010) 560 U.S. 48), and mandatory LWOP for juveniles (*Miller v. Alabama* (2012) 567 U.S. 460).  Following that authority, our California Supreme Court has held that a de facto LWOP sentence for juvenile nonhomicide offenders violates the federal constitution (*People v. Caballero* (2012) 55 Cal.4th 262), as does a 50-years-to-life sentence for juvenile nonhomicide offenders (*People v. Contreras* (2018) 4 Cal.5th 349, 356).  Youth-related mitigating factors must be considered before imposing LWOP on a juvenile homicide offender.  (§ 190.5; see generally *People v. Gutierrez* (2014) 58 Cal.4th 1354.)  In line with this evolution, our Legislature established a parole eligibility mechanism that provides a person serving a sentence for a crime committed as a youth a meaningful opportunity for release upon a showing of rehabilitation.  (§ 3051.)

Legislators are redefining culpability for various crimes. Senate Bill No. 1437 (Reg. Sess. 2017–2018) §§ 1–5) amended the mens rea requirement for murder, restricted the circumstances under which a person is liable for felony murder, and eliminated the natural and probable consequences doctrine as it relates to murder.  A person convicted of murder under a felony murder or natural and probable consequences theory may petition for vacation of the conviction and resentencing if certain conditions are met.  (§ 1170.95.)  Senate Bill No. 1437 is part of a broad penal reform effort to ensure our murder laws fairly address a person's individual culpability and to reduce prison overcrowding that partially resulted from lengthy sentences incommensurate to the individual's culpability.  Senate Bill No. 1437 thus effects a

27

sea change in sentences that have been and will be imposed on various offenders.

The sum of these changes show that legislators and courts are reconsidering the length of sentences in different contexts to decrease their severity. Insofar as these changes speak to the second and third *Lynch* techniques, the changes suggest disproportionality in Avila's sentence, one that even as a recidivist exceeds the punishment in California for second degree murder, attempted premeditated murder, manslaughter, forcible rape, and child molestation.

We are aware that lengthy sentences like the one imposed on Avila have been common, especially when the Three Strikes law was at play. However, common is not synonymous with constitutional. What has become routine should not blunt our constitutional senses to what shocks the conscience and offends fundamental notions of human dignity. Crushing oranges, even for the purpose of trying to steal or to extort money, is not constitutionally worthy of the sentence imposed where, as here, the defendant's criminal history on close examination cannot bear its share of such a sentence.

Life in prison for destroying fruit, even when done by someone with a criminal record in the course of an attempted robbery, robs recidivist sentencing of its moral foundation and renders the solemn exercise of judicial authority devoid of meaning. There comes a time when the people who populate the justice system must take a fresh look at old habits and the profound consequences they have in undermining our

institutional credibility and public confidence.  In Avila's case, the time is now.[18]

## DISPOSITION

The sentence is vacated, and the matter is remanded for resentencing with the direction to the trial court to strike two of Rene Avila's prior strike convictions and to reconsider his sentence in light of the views expressed in this opinion.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.


DHANIDINA, J.


We concur:


EDMON, P. J.


EGERTON, J.

---

[18] Because we remand for resentencing, we need not address Avila's contention that fines and assessments the trial court imposed must be stricken under *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  Further, on remand Avila may raise Senate Bill No. 1393, which allows a court to exercise its discretion to strike or to dismiss a serious felony prior for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1, 2.)